Thank you, Your Honor. Good morning. Patrick Coughlin and with me are my partners, Sandy Spetkoff and Susie Alexander, and I'd like to reserve five minutes if I might at the end. Sure. Thank you. Your Honor, I'd like to start off with what this case is not about. This case is not about a NASDAQ meltdown, a change in a gross national product, or anything like that, a recession, as these would have it at the start of their brief. That's not what happened here at all. If you take a look at Exhibit B to the reply brief, what you have here is Apple basically outperforming the NASDAQ during the time, and when this is announced that they missed their expectations, you have the stock crushed. It's a $10 billion market loss in one day. They announced at the time they make that announce that they were substantially below expectations, and then they talk about earnings and revenue misses in specific numbers. So this case is not about some downturn in the market. They don't mirror the tech stocks as the defendants would start off their brief. This is very Apple-specific. And now I want to put it in context to what we're talking about. This is a fraud case. It's a 10B case, and we have to show SIA. The district court found that we had pled, with particularity, the falsity of these statements. District court found, as to the cube, the imperfections, the functionality impairments of the on-off switch, that those were significant enough and weren't just mere puffery or just weren't, in the defendant's word, common problems. With particularity, we had pled the falsity of those statements when Jobs had come out onto that stage and touted that cube and what it could do and the functionality of it. The dual processor was the same. The district court found, with particularity, in light of the defect memo, that we didn't need to name the number of customers affected, especially when you're talking about the operating system that wasn't available to anybody. As to the K-12 sales, the primary sales, this is a key component of this case because it drives into this quarter. And the district court, again, found that the allegations were not mere puffery, that are not puffery statements in the context of a transition that affects 25% of your revenue, that those weren't mere puffery statements as the defendant. So we start off with what the district court has found. And now I want to put it in context. What was going on at Apple at that time is, Apple is one of the few computer companies that doesn't use Microsoft processing. They developed their own processors, the OS9 and the OS10, and they're currently doing another one. They have to be innovative to survive. That's what they say. And they have to have new products to do that in the pipeline. At this time, it had been two and a half years before they had a new product coming out. The stock was drifting down. They had just missed 50,000 units in their IMAX sales. And key is that they, the quarter before, had started transitioning their sales, their school sales, in-house. Now that's a business decision. Whether that's right or wrong, we don't quarrel with that. You make a decision to bring it in-house, those people had been with Apple for 20 years as independent agents, that's the decision Apple makes, a management decision. But when they make that decision, and they tell those people, and then they know that those people are going to sell everything they can in that corner, because that's it for them. They're out. And they're not going to build the pipeline. And those people, a bunch of them come, almost half of Apple's in-house sales force is made up of workers from those 50 independent agents. So they know what happened. They've made that announcement, the sales transitioning is occurring, and now Apple's got a problem. They've got two new products coming out at this time, supposed to drive sales for the back-to-school and Christmas time period. That's what Phil Schiller says from Apple on July 25th. Those are Apple's words, that these new products will drive the sales for the quarter, okay? And what happens? The products aren't ready. We've got 29 witnesses talking about the product defects, project managers, from material managers to project design managers. We specifically name people that met with Jobs. We tell how Jobs got into the lab, what they knew, when they knew it, who they told it to, and what the constraints were on the product. And the district court noted some of that. In fact, what the district court noted was going into the class period, the 50 percent reject rate, they put things off, the faulty on-off switch, the cracks in the cube noted by CW6, the line shutdown after the start of the class period, from one to two weeks, and the debate whether to ship at all. CW10 noted that these were a known issue internally. Now remember who's named as a defendant here. Only Apple. Only the company is named as a primary violator. Jobs is named as a control person. Now we have to show Cyanar that people in the company knew about these problems. And I submit when 29 people are talking about them, it's listed as a known issue. It's listed as a class A bug, as the district court found, a line stopping type bug, and reported throughout the company. And you have the top people, hands on, doing something about it. I think that you have Cyanar. But let's step back to see what the district court looked at. The district court, the defendants argued that the manufacturing problems with new products were minor and not unusual. The district court in its original order, which it adopted as it moved to a second order and didn't repeat, said, this is not so. The district court noted based on defendants' own statements, the cube's appearance was integral part of the product. Similarly, the power switch problems, though seemingly simple, the district court noted, impaired the basic functionality of the machine. The falsity and the materiality of those statements was plagued with particularity. Okay? The defendants argued the statements were too general, i.e., many cubes defective. No, the district court said no. That the allegation above, plus the Rubenstein defect memo issued in August, which talked about the cube's imperfections, the faulty switch, and the dual processor problems, and was circulated to senior management, that those allegations all taken together were specific. Defendants stand up and argue, well, they don't quantify the number of cubes that were defective. That's a red herring. When you're starting off production, when you're starting something and to get it out the door, and defendants later admitted it was the start that was slow, they couldn't make enough cubes. And we have the materials manager, CW37, and she says, I was responsible for it. The plastic cube was a pacing item, and it prevented us from getting the supplies out. So the severity of the problems were there, and the district court found they were pled with particularity as to the cube. This case is mainly about that cube. But take out CW37 at page 8 of the Court's ruling. And right after he's mentioned there, the Court says, as defendants point out, plaintiffs fail to allege the contents of any specific memos, messages, or meetings. They are required to do so. Up to now, you've been citing the district court in a way that led me to believe that you'd won. I wouldn't be here if we'd won. I wish that. When are we first? I wouldn't be. I'd be over there probably. Well, actually, we'd be in trial. What about that? And that is? You say that you did allege the contents of specific memos, messages, or meetings as to these production defects? Absolutely. And that's what we say the district court erred. And let me show you exactly where we did that and how we did it. The key as to the document is what we call the Rubenstein memo. And it's a memo that was sent out in August. We have two witnesses that identify the memo, CW9 and CW38. And they're in positions to know, and they received the memo. They thought it was unusual and rare to receive such a memo just as a product was being issued. So now we know where the memo came from, Rubenstein's office, who received it, CW9 and 38 say senior management, including them, that they received it, that it talked about the specific defects, about the cube's imperfections, about the functionality problem of the on-off switch, and about the dual processor problems with the operating system. So now we've done the who, what, where, when, time. And so we have a document inside Apple. And this is aside from it being known internally as a class A bug and as a known issue. Those are different documents. And those are different tracking systems that they had. This is a specific memo that went out right before they sold it. And you mentioned it talked about the cube's imperfections as far as the plastic formation, the non-functionality of the off-on switch. And there was a third defect which I didn't catch. The dual processor, the lack of the operating system that allowed you to use the two brains. The dual processor had two processors. And that was supposed to make it twice as fast. When they first sent it out, the software that was available, there was only one, the operating system that they had could only use one at a time. And in fact, it was worse than that. Because of that, they were knocking each other off. And that was a problem with that product and constrained the sales of that product. The system that was supposed to be issued with it, OS10, the operating system, didn't get out for another six to eight months. So when the first product first came out, it was no faster than a single processor. They weren't charging any more for it, though, as far as I understand. They weren't charging any more for it. So what's the big deal about that? Well, you can't use it. Why buy it? Well, if you use it, it's just they hadn't yet, the new software hadn't yet been available. Well, the new software hadn't been available. And I said it was worse than just a single. Because the people inside said it was knocking each other off. I didn't understand that to be your allegation. I understood your allegation to be that they put out this product that uses two processors, but that other providers didn't yet come up with software that would take advantage of this capability. That's the main thing. I mean, they touted it as a brand new two brains better than one. And yet it was only really one. And the software wasn't available. And we think the district court erred in thinking, hey, people could have made that. Jobs himself said he didn't think anybody would buy it in anticipation of of the software coming out. That's something that he said. And that's in the record. So that allegation that that they put forward, that people could have made that software and people could have come forward. Apple itself was scheduled to issue the right operating system with the release of that product and did not. But I don't want to move away from the core of the case, which is acute. That's half dismissed. That's 90 million dollars of the hundred and eighty miss. OK. And it's the queue that's supposed to drive sales. That's what analysts say. But more importantly, that's what Apple was saying, that these were the new products that were supposed to go for years. I mean, a product that was canceled within a year of its release. The queue was supposed to drive sales for years. And it did because it was so defective. The key is what you what the court, I'm sure, wants to know is, well, how did they know at the time? And Readwright says the particularity of the facts as to falsity can also be used in analyzing the knowledge that jobs and Rubinstein. And I think we should just focus on those two for the queue. Had we no jobs, went to the lab constantly during this time period. We know we had discussions with Tranco CW thirty seven. The materials manager saw those discussions. Talk to Trango after about what Trango told jobs, knew the defects in the cubes and Trango confirmed that they were talking about the defects in the cube. Other witnesses say jobs were shown defective cubes and knew about him. He was a hands on guy. This is a guy who, according to the newspaper articles that are in the complaint, wants to know if there's magnets on the back of the doors. If you compare this case to Oracle, Larry Ellison, who's also known as a hands on guy jobs is twice the hands on guy that Larry Ellison is. And the Oracle case, he's in the minute detail. He talks about the product and how they function. You don't see that with Larry Ellison. Larry Ellison will say, hey, this is new thing. We've got a new application here, a new 11. I this is twice as this is twice as hands. And the case that we talked about earlier, Gal, where the guys were saying, hey, go in and do the software and start it up for one hundred dollars in the garage, you know, and we'll book it. And they again said, hey, those people were deeply involved in deciding how to book some of the revenue and things like that. Jobs is twice as hands on. He's in the laboratory checking on the machines. And if they're going to get out, he's the guy that goes forward and talks about the machines. So these are the machines that are supposed to drive the revenue when they have the salesforce transition coming up. And what did the court say about the district court about the salesforce transition? That the statement said it was progressing nicely. And then later in August, September, that it was accelerating, that those were not mere puffery. OK, how did they know? The question is, because I've got to meet the standard, a strong inference of cyanide. How did they know that those statements were false? Well, in the first instance, half their salesforce came over from the independent people. So their salesforce knew. Now, this is an instance where I do specifically give the specific documents that are tracking the specific documents that are tracking the salesforce as it's being as it has come on in the transition. We have a witness who is from Canada who said it dropped by 20 percent with the transition. What dropped 20 percent sales? The sales dropped 20 percent with the transition. Paragraph 147, that half the people had come over from the independent people. Now, these witnesses identify CW36, CW25, CWs 23 and 24, and CW6. They identify weekly sales reports, tell what's in them, units sold, and revenue. And they tell exactly what's going on at the time. And at the time, at the start, there was nothing in the pipeline. Not unusual. They just fired everybody. Jobs' later admission says, hey, this was a train wreck. When our new people got there, when our new people got there, there was nothing in the pipeline. So he admits later that it happened at the start, that at the start of this transition, there was nothing there for them to build on. And with – Go ahead, because you thought – you mentioned you wanted to reserve some time. I will. And I'll just stop there. So we have the particularization. We have the falsity as to these statements. And I think we have enough involvement with at least two of the top officers, Jobs and Rubenstein, to show that they knew about these different product defects. I mean, Rubenstein's office issues a memo. Then he sells 100 percent of his stock. He sells 100 percent of his stock right after that. And this is at a time when Apple is using their own stock, their own money, shareholder money, to buy stock back. And yet this guy sells 100 percent of the stock that he owns. With his vested options, I think it's 34 percent, close to 40 percent of what he owns entirely in the company. And I'll reserve the rest of my time. Thank you so much. May it please the Court, I am George Riley. I represent the defendants, Apple Computer, and its founder and CEO, Steve Jobs. I'm joined by David Eberhardt. May it please the Court, this case arises solely from the fact that Apple missed a revenue target by about 8 to 9 percent and announced this on September 28, 2000. There are no allegations of accounting fraud. There were no revelations of corporate malfeasance. There wasn't a product recall. There wasn't a single consumer lawsuit about the products at issue. Instead, a year later, the plaintiffs sued and claimed that Apple somehow knew in advance that lower-than-expected sales in four separate areas would converge in what the plaintiffs call a perfect storm. You know, the bad news came out on September 28, right? That's correct. And what, 15 days earlier, Jobs was still predicting they were going to be on target? What Mr. Jobs said on September 13, he was asked a question about the Cube. And the question was, we understand there are spot shortages, demand in excess of supply. And he says, we don't predict profits or losses, but with regard to the Cube, if there are shortages, it must be because demand is in excess of supply. We think we will hit our forecast, again, with regard to the Cube. And the record is very clear about that, Your Honor. What does that mean, we're going to hit our forecast? It's with regard to the Cube. Apple had announced its internal target for shipment of the Cubes of 150,000 Cubes. According to the record, and this is at page 351 of the record, Apple began shipping the Cube in August, the first week of August. Mr. Jobs said in July, on July 19, the product will ship in August. And unlike so many cases that have been dismissed on securities grounds, this product shipped when it was announced. It shipped in August. And according to the record, again, at page 351, 377, Apple began shipping in quantity, 3,000 Cubes a day. And by mid-August, was ramping up to 5,000 Cubes a day. So given the number of shipping days when Mr. Jobs was asked this question, Apple would have shipped between 70,000 and 80,000 Cubes. With the remaining number of days, he spoke the second week of September, at the rate of 5,000 a day, they could have easily met the 150,000 number. Unfortunately, demand for this innovative new product flattened out. Apple sold 107,000 Cubes instead of 150. But as this court held in Lipton, the failure to anticipate consumer demand for a new and innovative product is not securities fraud. When the Senate of the United States passed the Securities Reform Act, they recognized that a failed product launch is not securities fraud. The question is, have the individual officers of Apple made deliberate statements to mislead their shareholders, knowing the statements were false? Knowing they were false. Well, let's look at the record on that point. At page 25, the district court, in discussing the alleged flaws with the Cube, makes the point. Nothing in the record reflects on Steve Jobs' mental state when he made the statements that he did on July 19th. The only communication, the only communication with Mr. Jobs that's alleged with any degree of particularity is with an engineer, CW5. And CW5 reports that Steve Jobs said, let's get these problems fixed, let's get it resolved, and let's get this product launched before Macworld on July 19th. So what the record suggests is you have a CEO working intensely with his engineers, and he is confident, confident that they can resolve the problems and the product will be a great success. As this court said in Ron Coney, in a securities case, you must distinguish between confident or honest optimism and deliberate intent to defraud. The record in this case clearly supports that Mr. Jobs had an honest optimism that the product would sell well. There are five separate areas that support that honest optimism. First, as mentioned, Mr. Jobs was working with an engineering team that had repeatedly delivered successful products. He had every grounds for confidence in that team. Second, Apple entered into $260 million worth of supply component agreements for the Cube. Apple would never have entered into these long-term supply contracts if it knew the product would fail, as they allege. Three, when the product premiered, it had outstanding reviews. Every commentator, every analyst cited in the record praises the Cube for its beauty and its power. Five, when the product shipped on time, according to the analysts at 377 and 378, demand was brisk. Ultimately, Apple did not make its target of 150,000 Cubes. But that failure, as this court held in Lipton, does not constitute securities fraud. All of the facts reasonably construed, as Gompers requires this court to do, would suggest that Mr. Jobs' statements were the product of honest optimism. Pardon me. His statement 15 days before, on September 13th, that we're on target, which you interpret to say we will hit our present target, which is 150,000. Is your statement that he was misinformed about what actual sales were? No, not at all. In fact, again, Your Honor, he's speaking on Wednesday, September 13th. So there are a couple of weeks into September. The record is unequivocal. They were shipping 3,000 to 5,000 Cubes a day. At that rate, by the second week of September, they were on target to meet their 150,000 goal. But it's plainest burden to show, because this is a forward-looking statement. Is it your position that all sales stopped as of September 13th? No, not at all. Again, given the numbers, Apple, beginning shipping in the first week of August, would have shipped, by the second week of September, approximately 80,000, between 70,000 and 80,000 Cubes. They had three more weeks of shipping left in that quarter. Unfortunately, demand flattened out, and they only got to 107,000 Cubes. But, Your Honor, the key here is what did Mr. Jobs know on September 13th, and what possible motive would he have had to mislead the market? There were no stock sales. Not a single defendant in this case, not a single speaker in this case, sold stock. In every case in which this Court has reversed and found sufficient evidence of scienter, two factors were present. Number one, there was particular facts about what was known on a contemporaneous basis, what the speaker knew at that time that was not just mere negligence or, as in DSAM, a failure to see the obvious, but what did they actually know that would indicate that they are deliberately misleading the market? And second, what motive did they have to mislead the market? Well, actual knowledge is required. Actual knowledge is required for scientific and forward-speaking statements. That is correct. But that's not necessarily required as to present facts. What you need there is a deliberate recklessness. That is correct. The standard for statements such as the alleged statement by Mr. Oppenheimer would be deliberate recklessness. But with regard to Mr. Jobs' statement, he is looking to the future. He's saying, I think, it's a qualified statement, I think we will hit our forecast. I think we will meet our forecast. That requires the highest showing, a showing that Mr. Jobs knew that his statement was false, and the plaintiffs don't meet that. In fact, they have never alleged a motive, not a motive just to do well, to drive Apple's stock price, which, of course, is a motive for completely legitimate behavior, but a motive that divorces the interest of Mr. Jobs and the other accused officers from the interest of the shareholders. Mr. Jobs did not sell a single share of stock. Mr. Oppenheimer and Mr. Anderson did not sell a single share of stock. This case is unique. There is no motive for these alleged deliberate misstatements in this record. Now, the plaintiffs have made a great deal about the so-called product defect memo, and I'd like to address that. First, in the original consolidated complaint, they gave the title of that memorandum, Memorandum to Frontline Service Representatives, the people who answer the phone at Apple and handle customer complaints. Not product defect memo. That was never alleged in the first complaint. Later, they changed that title. It doesn't come from any CW. It comes from the attorneys. According to Silicon Graphics, they must allege with great particularity the actual content, the recipients, and the author of that memo. They come nowhere close to that. They generally describe that it related to flaws in a product and ways of handling complaints. Well, all new and innovative products face those types of challenges, and a way of handling complaints in no way indicates that Apple, that Mr. Jobs and Mr. Anderson, somehow knew the product wouldn't be successful. There's nothing at all alleged in that memorandum to suggest that. The recipients are not identified, and the author is not identified. In Silicon Graphics, the recipients were the defendants and the speakers. That memorandum was insufficient. Here, this memorandum doesn't even begin to reach the threshold of Silicon Graphics. It is instructive, and I think illuminating, to compare this case to Oracle, and there are four important distinctions that reveal the inadequacies of the complaint and why the district court got it right. First, motive. In Oracle, there were sales of almost $1 billion in stock by the defendants, by the defendants. In this case, zero sales by Mr. Jobs, zero sales by any person who allegedly made a misleading statement. Distinction number two. In Oracle, there was accounting fraud. Accounting fraud, there is no positive inference that can be drawn from accounting fraud. There's no basis for honest optimism about accounting fraud, but there was accounting fraud in Oracle, and in this case, there is no intimation whatsoever of accounting fraud. Number three. In Oracle, what accounted for their miss, they missed their revenue target in one quarter, were primarily four sales. Four sales accounted for 75% of the miss. All four of those sales occurred early in the quarter, and the record was very clear. They were identified, the actual amounts, the quantifications of the sales, and Mr. Ellison admitted that he was involved in those sales. A very strong inference of a scienter that can be drawn from that. By contrast, Apple's fourth quarter ends on September 30th, and in Apple's fourth quarter, all of the analysts agree, and this is at pages 351, 357, and 378. September is the key to Apple's quarter, and there's nothing in this record that would suggest that in July, when the statements were allegedly made that were misleading, that those speakers could somehow foresee what would happen later in September. Nothing in the record whatsoever. And fourth, in Oracle, there was great particularity about the allegations of communications. The CWs that were cited in that case actually knew about the alleged accounting fraud. The contents of the documents were pled with particularity, and in fact, copies of the documents were made available for the court to review. None of that in this case. None of it whatsoever. So Oracle illuminates the insufficiencies in this case. I'd like to respond briefly to the education allegations. This is the one statement that the plaintiffs point to that would have to meet the reckless disregard standard, and that's Mr. Oppenheimer's statement on July 18th that the sales force reorganization was progressing nicely. Now, that is one day before the class period. According to the complaint, the alleged fraud relates to statements made during the class period, and under the Second Circuit's decision in IBM, that statement should be excluded. But even if this court considers Mr. Oppenheimer's statement, look at the facts that were available and apply the learning of Gompers. Reasonable inferences from the facts must be drawn in the defendant's favor. What did Mr. Oppenheimer know? The reorganization began in the previous quarter, the third quarter, an important quarter for education sales because schools are on a June 30th fiscal year. The reorganization began that quarter, and Apple's sales in education increased by 14% over the previous quarter, over the same quarter in the previous year. In other words, education sales had gone well. Second, Mr. Oppenheimer knew, and this is undisputed in the record, that higher education sales force reorganization had taken place the year before, and that had gone very well. So when he spoke, again, on the day before the class period, July 18th, the facts that were available to him would suggest that in truth the reorganization had gone well. Sales were up. It followed the same pattern as in higher education. Well, then what is the plaintiff's burden? They must point with great particularity to actual sales reports, memoranda that meet the Silicon Graphics standard, show who sent it, who received it, and allege its particular contents. Nothing with regard to that is alleged with regard to Mr. Oppenheimer's statements. Nothing. The record is silent on that point. Turning to the dual processor. The plaintiff's theory of the dual processor, as the Court recognized, is that Apple charged too much for a product that has second processor when few software titles were available to make use of the dual processor. Again, their own facts contradict that theory. As the Court has recognized, the second processor was added for free. Importantly, the most important software title to the high-end computer market that uses the dual processor is Adobe Photoshop. Adobe Photoshop made use of the second processor. In fact, at page 378 of the record, the analysts say, Adobe Photoshop running on the dual processor is a compelling product combination for the consumer. Number three. Apple released on September 13th, and this is at page 369 of the record, Apple released its public version of Mac OS X, which makes use of the second processor. So Apple could reasonably conclude, just as the district court did, that a processor that was added for free, that ran the most important application, that ran the early version of Mac OS X, would attract new software to run on the machine. In short, in this case, the plaintiffs have alleged that beginning in 1997, Apple had one foot in the grave. Apple had lost a billion dollars in the previous year. And Steve Jobs and a new management team returned to the company. And by taking risk, by investing in new and innovative products, they delivered 12 quarters of profitability, including the class period, which saw increased revenues and increased profits. And today, that very same management team has just delivered the most outstanding quarter in Apple's history. But not every innovative new product can be a success. When Congress passed the Reform Act, it intended to encourage forward-looking statements about a company's prospects and its products, statements much as Mr. Jobs made on August 13th, much as Mr. Anderson made on the day before the class period on July 18th. Congress afforded protections by requiring that the plaintiffs show a strong inference that the speakers were deliberately misleading the shareholders and making knowingly false statements, knowingly false statements. Nothing in this record separates Mr. Jobs' honest optimism, perhaps misplaced, but honest optimism about Apple's demonstrated history and success from deliberate fraud. The district court carefully reviewed the entire record, and after 33 months, the plaintiffs had no additional facts to allege. The district court's decision should be affirmed. Thank you, Mr. Riley. Gentleman? Thank you, Alex. I don't think I'm just nitpicking when I challenge the statement just made by counsel that said Apple didn't give specific guidance. On July 18th, and there's a transcript of it, Mr. Anderson said, we're targeting over 10 percent sequential growth. They say, oh, they didn't give guidance as to EPS. Well, they gave the margins, declined down 2 percent to 26.8 to 27. They gave the operating expense increase 15 million, and they gave the tax rate. It's just a matter of addition, and every analyst then came out with 40-plus cents. If you tell everybody what the revenue is going to be, what the margins are going to be, what the tax rate is going to be, and what your operating expense is, I say that's guidance. What was the motive for all of this? The motive for all of this is that they had to get the new product shot. They were declining. They just missed the 50,000 sales in IMAC. They had gone through with the salesforce transition, which they wouldn't have done. There's no doubt they were hoping that these products would work and make it. It just didn't happen. As the CWs say, it stretched out from six months to 12 months trying to make this cube. He says there was no consumer suits or any of this stuff. They canceled this cube within a year. They were working on the problems all the time, and just the opposite of what he said. Demand, according to CW 31, outstripped supply well into 2001. In other words, when Jobs spoke and said, if you can't find them, it's because, you know, we're selling so many, no, they couldn't make so many. And as Your Honor said, are we to believe that Jobs, two weeks before the end of the class period, was uninformed about that they were going to miss the number, their target, 150,000, that was going to drive the revenue for that quarter by 33 percent? That's preposterous. We can't have a rule that says that CEOs who are hands-on don't know what's going on in a company. I don't care what kind of company you run. You know, if you will know what's going on, you run a construction company, no matter what you're running, the top people will know what's going on with a major product, if there's cracks in it, if the line is shut down for a couple of weeks. He was in the lab. It was hands-on. It's more than Oracle. It is just like the first Apple case, and it's just like Hannon, those two product cases. And the motive was they had to have new products to drive the sales. Those are their words, not mine. They spoke those words on July 26th that these products were expected to drive the sales. And then that's not all Jobs said two weeks before the end of the class period. He was asked about the rumored shortage, and he said, I'm extremely happy. How could he be extremely happy? They couldn't make them. They couldn't meet their target. If he knew the target was 150, and that's the first real admission that they say, that's what they admitted, even though we said they said all along, and they did, they're going to miss that by 33%. And two weeks before the end of the period, he's saying, hey, we're extremely happy. Can't find them. They're flying off the shelves. That's just, I think if we're going to hit, I think we're going to hit our forecast for this quarter. I don't think it's just limited to the cube, and I don't think they get that inference at this stage. Most of the arguments he just said, we did this, we were trying to do this, we hope to do that. For example, when he talked about the K-12, well, you know, they'd done it with the higher education. Why not now? We have specific facts here why that transition was not going good at the time, that there was no pipeline when they got there. And then we have jobs admission that it was a train wreck. And that July 18th statement isn't the only statement. Anderson, the CFO, spoke to analysts on September 6th and said it had accelerated. So in that September timeframe where they say the miss finally occurred, even though we know it started at the beginning because jobs say that for the sales transition, we know that they had not accelerated. It's later contradicted. I think the temporal proximity of these statements, you know, find the knowledge and the fraud. And I think that we fled it and hooked it up. I think the district court was in error on that. Thank you very much, both gentlemen. The case to start you to submit it. Thank you.
judges: Alarcon, Silverman, Bea